(No. 15025.—Reversed and remanded.)
HANNAH LOUISE MUNZ *et al.* Appellees, *vs.* CHARLES G.
BORT, Exr., Appellant.

*Opinion filed February 21, 1923—Rehearing denied April 6, 1923.*

1. WILLS—*when evidence of undue influence is too remote.* In a suit to set aside a will on the ground of mental incapacity of the testatrix and undue influence of her son, who is the chief beneficiary, testimony as to a statement made by the testatrix twenty-two years previous to the trial that her son wanted her to make a will but that she did not intend to do so as long as she had her mind, is too remote to be competent.

2. SAME—*when opinions of mental incapacity are entitled to little weight.* Opinions of witnesses for the contestants on the issue of mental incapacity that the testatrix was getting childish are entitled to little weight when not based on facts sufficient to justify the conclusion.

3. SAME—*what does not show unsoundness of mind.* In a will contest on the issues of mental incapacity and undue influence, the fact that the testatrix gave most of her property to her son and but little to her daughter does not, alone, justify the conclusion that she was of unsound mind, as the law does not require the maker of a will to make a fair and reasonable disposition in accordance with the rules of descent.

APPEAL from the Circuit Court of Whiteside county; the Hon. NELS A. LARSON, Judge, presiding.

WARD, WARD & WARD, for appellant.

R. W. E. MITCHELL, and McCALMONT & RAMSAY, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is a bill in chancery filed in the circuit court of Whiteside county by appellees to contest the alleged last will and testament of Augusta Bort, deceased. Appellant answered, denying the principal averments of the bill. Issues were joined and the matter submitted to a jury, which rendered a verdict finding that the writing produced in evi-

dence was not the last will and testament of Mrs. Bort; that at the time of its execution she was not of sound mind and memory, and that she was at the time of its execution unduly influenced in relation thereto by her son, Charles G. Bort. After motion for new trial was overruled and judgment entered on the verdict this appeal was perfected.

The facts of the case are shown to be substantially as follows: Augusta Bort, a woman eighty-one years old at the time of her death, lived on her farm nine miles north of Sterling, in Whiteside county. Her husband had died some years previous, and at the time of her death she left surviving her a son, Charles G. Bort, the executor, who lived a near neighbor to the testatrix; a daughter, Hannah Louise Munz, one of the complainants herein, who with her husband for years had lived several miles from the old homestead; and a grandson, Walter E. Bort, the other complainant in this case, who was the son of John Bort, deceased, who had left home many years ago. The testimony shows that the testatrix was born in Germany, came to this country when young, learned to speak the English language but with a German accent, and used the German tongue in the family and generally in conversing with those familiar with German, also using English intelligently when talking with English-speaking people. She did not read or write English, as her education was in the German schools exclusively. In November, 1920, she made a will, and later, on March 9, 1921, she executed another will, (the one here in question,) which, other than the formal opening and closing and revocation of former wills, and the last clause appointing her son, Charles, executor without bond, is as follows:

"*First*—I direct my executor hereinafter named to pay all my just debts and funeral expenses as soon as may be after my death, out of my estate.

"*Second*—I give, devise and bequeath to my son, Charles G. Bort, (a certain described eighty acres) to him and his heirs forever.

*"Third*—I give, devise and bequeath to my daughter, Louise Munz, (a certain described sixty acres) to her and her heirs forever.

*"Fourth*—I give, devise and bequeath to my grandson, Walter Bort, son of my deceased son, John Bort, the sum of two hundred ($200) dollars.

*"Fifth*—I give, devise and bequeath all the rest of my property that I may own at the time of my death, to my son, Charles G. Bort, and my daughter, Louise Munz, to be divided equally between them, share and share alike, to them and their heirs forever.

*"Sixth*—I am now indebted to my daughter, Louise Munz, in the sum of three thousand ($3000) dollars in the form of a promissory note, and in case said note, or any portion of it, remains unpaid at the time of my death, the same is to be canceled and the whole amount considered paid in full, on account of my said daughter, Louise Munz, receiving the real estate willed to her in clause 3 of the will."

Mrs. Bort left as a part of her estate one eighty-acre tract and one sixty-acre tract of land and personal property amounting to $100. The evidence shows that Charles G. Bort owned eighty acres of land adjoining the eighty-acre home farm of his mother, which he at various times farmed in connection with his mother's eighty acres adjoining, living with his mother on her home farm, but after he was married, having no improvements on his own eighty acres, he moved to Sterling, and apparently lived there and arranged for running his mother's eighty by tenants. The record shows that he was always kind and attentive to his mother; that she had confidence in him and relied on him; that her other son, John, was given his share of the estate when he left home, and the record does not disclose that he afterwards ever had anything to do with the business affairs of his mother. The evidence shows that up to 1917 the testatrix enjoyed good health and assisted materially in the conduct of the home eighty; that some time during 1917

she became afflicted with arteriosclerosis, which the evidence tends to show caused at times partial paralysis of one side; that this was followed by what her family physician testified were embolisms or blood-clots in her extremities and in the brain, and he also testified that it was a blood-clot which caused her death, March 22, 1921. The evidence shows that some time previous to March 9 she was in such condition, physically, that she frequently had to have a nurse to care for her; that a few days before March 9 she requested Mrs. Susie Jacobs, who was then nursing her, to call her son over the telephone, saying that she wished to see him on business; that Charles asked the nurse over the telephone if she thought the business was urgent, and on being told that she did not think so, he did not comply at once with his mother's request; that a day or two later Mrs. Bort again requested the nurse to telephone him and ask him to come and see her, and in response to the second call he came to his mother's home in a very short time; that she told him, in the presence of the nurse, that she wished to change her will and what changes she desired to make; that Charles told her he thought she would have to draw a new will, and that whatever she wanted to do would be all right so far as he was concerned. After leaving his mother's home Charles went to the office of her attorney, A. A. Wolfersperger, at Sterling, and was told by the stenographer, Mrs. Anna Z. Bishop, that Wolfersperger had gone South for several weeks; that Charles told her his mother wanted to change her will and he wondered if it could be done before Wolfersperger's return, as his mother was not well and it worried her; that Mrs. Bishop replied that she thought the will would have to be re-written, and suggested that John M. Stager, Wolfersperger's partner, be talked to, and if he said it was all right she would undertake to re-write the old will, making the changes suggested by his mother,—that is, that the will should give her grandson, Walter E. Bort, $200, and provide for canceling the

$3000 note held by the daughter against the mother. Mrs. Bishop testified that either Charles Bort or Stager called her over the telephone later, but she could not tell which one, and told her to re-draft the testatrix's will, making the changes suggested. This will was drawn on the date it bears, March 9, 1921, and the evidence shows that on that day, towards evening, Charles took Mrs. Bishop and Stager, the latter having another errand of a similar nature in the same neighborhood, to the home of Mrs. Bort; that all three went into her room, and that Stager, who was not acquainted with Mrs. Bort, was introduced to her, whereupon she told him she knew his father, mother and uncle and had bought the first set of dishes she had used from his uncle; that shortly after they arrived Charles left the room which his mother was occupying and did not return until after the will had been executed; that Stager and Mrs. Bishop visited for a little time, and later Mrs. Bishop produced the will she had re-drafted and read it to Mrs. Bort, who said, "That is just like my other will, with these two changes," to which Mrs. Bishop replied, "It is," and that then Mrs. Bort prepared a table and got the pen and ink and signed the will and requested Mrs. Bishop and Stager to sign as witnesses. The testimony shows that Mrs. Bishop took the will with her and later produced it in court for probate in the same condition, without change. The evidence tends to show that Charles came into the room after the will was executed to bid his mother good by and then went away with the two witnesses.

The only evidence offered in the record which has any bearing as to undue influence exercised on the testatrix by Charles is the testimony of the nurse as to her calls over the telephone and what happened when the son came to see his mother in response to such calls as to changing the will, and the testimony of Mrs. Bishop and Stager as given above, except the testimony of Mary Baucum, (the mother of appellee Walter E. Bort and the first wife of John Bort,

deceased,) to the effect that in September, 1899, twenty-two years previous, Mrs. Bort told her, while witness was visiting at Mrs. Bort's home, "Charly wants me to make a will and I don't know what to do about it; I don't want to make a will, and I am not going to as long as I have my mind." Mrs. Baucum's testimony on this point was rightly stricken out by the court as being too remote, it appearing that Mrs. Bort had previously to this last will written another will, and that this last will was simply a practical rewriting, with two changes from the former will.

On the question of the mental capacity of Mrs. Bort, the testimony of the witnesses testifying for the contestants and for appellant, as usual, is in conflict. Rev. P. C. Boyson, the first witness called for contestants, testified that Mrs. Bort had been a regular attendant at the church over which he was pastor from 1913 to 1918; that after she had been taken sick, in the fall of 1917, he visited her once a week up to August, 1918; that he had heard her converse with others in English; that from August, 1917, to August, 1918, he noticed her condition, mentally and physically; that on his visits he talked with her mostly about spiritual matters, but that on a visit on February 15, 1920, he observed a change in her mental condition; that his conversation at that time was on different subjects; that among other things she expressed a desire to go home,— to her heavenly home,—and talked about her sickness, saying she had no hopes of getting well again. This witness testified that he found her not the same that she had always been before; that in his opinion she was "getting a little childish."

Mrs. Bort's family physician, Dr. McPherson, after a long and detailed examination as to his medical treatment, said among other things: "I think when it came to complicated matters you would not want to trust a person who had a blood-clot on her brain." His evidence shows that the last time he saw her was a few days before her death

and that he made no autopsy; that his opinion was she died from a blood-clot on the brain, but this was simply a diagnosis, and he said he might be mistaken as to the cause of death. He also said: "I can say this: A person having the ailments she had, with blood-clots on her brain, I would know she could not be of sound mind."

Lena Webster testified that she saw Mrs. Bort from 1917 to the date of her death six or seven times, the last time being New Year's day, 1921; that during these visits Mrs. Bort talked to her about her illness, her helplessness, and that she could not use her hands as she used to; that she talked on these occasions about her flowers, and during witness' last visits talked mostly about her sickness and not about outside things; that during the first years of those visits Mrs. Bort would talk about everything; that during her last visit she seemed to have no interest in other things,—only herself,—and that she was forgetful in referring to later events. Based on the testimony as to her visits with Mrs. Bort and from what she had said at those times, this witness was of the opinion that she was not of sound mind on March 9, 1921.

Mary Baucum, the mother of appellee Walter E. Bort, testified the last time she saw Mrs. Bort was in September, 1919, and that she then noticed a change in her; that she had grown much older and was not so alert as formerly; that she talked a good deal about her flowers and some dead plants which she said would live again, but according to this witness the plants were practically dead. In the opinion of this witness Mrs. Bort, during witness' last visit with her, was childish.

Louis Bauer testified that he began working for Charles G. Bort in 1910; that he occupied one portion of the house in which Mrs. Bort lived until 1918; that he was in charge the last three years he was there, from 1916 to 1918, inclusive; that Mrs. Bort had charge of the household and looked after and managed it those years; that she was

taken sick in 1917 and had different women look after her at various times; that although living in different parts of the house, the entire family, including Mrs. Bort, ate at the same table and he saw her nearly every day; that during the last year of her life witness saw her every month or six weeks and talked with her; that the year before her death he started to work for himself about a half mile from her farm and remained there until her death but visited with her often; that he was there the Sunday week before she died; that she told him when he left to go to the other place that she was glad he was going to farm for himself and hoped that he would do well. This witness also testified that she spoke to him when he was about to go to another farm about planning to give him a set of knives and forks and went to the pantry and brought them; that then her nurse came into the room, and Mrs. Bort hid the knives and forks under her shawl, but that when he got up to leave she gave them to him. He also testified she would cry and break down when he would leave and that she did not do that when he first worked there; that she had acted childish over many things during the last year of her life. In this witness' judgment Mrs. Bort was of unsound mind at the time of her death.

Ricka Bauer was a niece of Mrs. Bort and had made her home with her for many years. She was a dressmaker and worked near by for other neighbors, and during the time she was engaged in this work she resided for about six years in the home of Mrs. Bort; that she sometimes saw her once a week and sometimes once a month during the last three years of her life; that she talked with her about the work and about her deceased husband, how the latter had worked years ago and how Mrs. Bort had worked; that before she was sick Mrs. Bort was sometimes interested in general topics and news, but after being taken sick she talked especially about her ailments; that she last saw Mrs. Bort for a few minutes on the Sunday or two before

she died and spent a day with her in February; that when she left Mrs. Bort cried and said that this was good by; that she wished witness could stay longer; that she said if she could not wait on herself like she had done before she would not care about living; that at this time she showed witness her flowers, saying she knew how to tend to them. This witness' opinion as to whether Mrs. Bort was of unsound mind in March, 1921, was: "I think she knew what she was doing, but she did not realize the effect of it."

Edith Bort, daughter of Mrs. Munz, testified that she saw her grandmother, Mrs. Bort, the second Sunday before she died and the Christmas before that; that she noticed changes during her sickness until the last time she saw her; that in former years she always insisted that witness speak in German and would talk in German herself, but in later years she insisted on using the English language while witness talked in German to her; that she thought her grandmother wished her to talk in German because she did not wish witness to forget the use of the German language; that after her grandmother was taken sick she did not seem to care whether witness visited her or not. In this witness' opinion her grandmother's mind was unsound at the time of her death.

Rosie Schriver testified that she was born in Germany and came to America in 1901 to the home of Mrs. Bort, the testatrix being an old friend of her relatives and possibly a distant relation; that she had made her home with Mrs. Bort until she was married, about nine years later; that after she left Mrs. Bort's she saw her about once a week and saw her two days before her death, the conversation being about the ordinary affairs of life; that during her early life she was very strict about the character and habits of the girls who came to her home, but that in later years she did not seem to pay any attention to that point; that she appeared forgetful, and in the opinion of this witness was childish.

Lena Jacobs was another girl who after coming from Germany went to live with Mrs. Bort in 1905 and remained most of the time with her until she was married, years later; that she saw her frequently during the last four years of her life, the last time about New Year's day; that she was feeble and talked a good deal about flowers during the last visit; that she was childish in her ideas and was of unsound mind, but witness gave no evidence from which such conclusion could be fairly drawn.

E. W. Schriver, whose wife had been practically raised by Mrs. Bort, testified that he saw Mrs. Bort two days before her death. The evidence shows that he was not asked nor did he say anything about her condition at this time, but gave as his opinion that she was childish.

Carrie Woesner, another niece, testified that the last time she saw Mrs. Bort was about the first week in December, 1920, three and a half months before she died; that when she first knew her she was very active and always busy; that she would inquire about the old country and wanted to know how things were there when witness left; that she talked mostly about her ailments during the few times witness visited with her. The opinion of this witness was that Mrs. Bort was getting childish, from her actions; that she did not think her mind was as good as it was when she first met her.

Ralph Ports, a son-in-law of Louise Munz, testified that he first met Mrs. Bort some eight years ago and since then had seen her on an average of eight or ten times a year, either at her home or at Mrs. Munz's home; that she would talk about something that happened years ago; that when he and his wife would leave she would become very nervous and break down, her hands would shake and she would play with her clothing; that she did not take any interest in present-day affairs like she did. This witness' opinion was that she was of unsound mind.

Two doctors testified for the contestants, in answer to a hypothetical question, that in view of the facts stated in such question they did not think the testatrix was of sound mind at the time the will was executed.

The two subscribing witnesses of the will, John M. Stager and Mrs. Bishop, both testified positively that at the time the will was executed they considered her of sound mind and memory. Mrs. Bishop had seen her at the time the former will was executed and had a talk with her, along with Stager, for a short time before the present will was executed and witnessed.

Pearl Plough, a nurse, testified that she saw Mrs. Bort on an average of once a week for six or seven years before she died, having taken care of her at different times during those years; that Mrs. Bort had a very keen and remarkable memory, discussed topics of the day, market quotations, crops, weather, inquired about acquaintances and friends she knew in town, kept track of the war operations, etc.; that she had a very good memory as to matters remote and present; that she saw no change in her mental condition during the years of acquaintance with her.

Mrs. Jacobs, the mother of Mrs. Plough, also a nurse, testified she nursed Mrs. Bort the last part of her life, from the first week in November, 1920, almost continuously until a few days before her death. She testified that for her age and condition in life she thought Mrs. Bort's "intelligence was exceptionally good."

Edwin Lorke, a younger brother of Mrs. Bort, had lived with her eighteen years, and testified that he never knew there was anything wrong with her mind, and that he had had many conversations on business dealings, and in his opinion her mind was as good on March 9, 1921, as it had ever been.

Elizabeth Lorke, who took Mrs. Jacobs' place as nurse for about ten days and also cared for Mrs. Bort the last few days of her life, is the wife of Edwin Lorke, and cor-

roborated her husband's testimony in every particular as to the mental condition of testatrix.

Fred Bogott, a tenant on the farm of Mrs. Bort for three years before her death and who lived in the same house, testified that he saw her practically every day during those years and until her death; that he had known her for some thirty-eight years; that she knew what she was talking about and so far as he could see her mind was all right; that she failed in health during the last days of her life and that there was no change in her mental condition during those years. Kate Bogott, witness' wife, and Fred Bogott, Jr., testified to the same effect as the husband and father, that Mrs. Bort's mind was sound. All of these last three witnesses had seen her almost every day during the last six years of her life and agreed that there was no change in her mental condition during those years.

Levi Zook, who had lived at the Bort farm house many years of his life, testified that he saw Mrs. Bort nine days before her death and spent an afternoon with her, carrying on a conversation about the topics of the day and the farm. This witness had been in the army, and some of the conversation was about his experiences during his time of service. He testified that in his opinion her mind was sound.

Judge Wolfersperger, who drew Mrs. Bort's first will, in November, 1920, had many conversations with her and testified that she talked intelligently and understandingly; that her mental condition was fine; that the will he drew for her was drafted at her dictation; that he did not see her after November, 1920, but that at that time she was of sound mind and memory.

There is substantially no evidence in the record that any undue influence was used by the son, Charles, as to the execution of the will, and on the question of the condition of testatrix's mind the great weight of the testimony sustained the conclusion that she was of sound mind and memory during the last years of her life and at the time

the will was executed. Many of the witnesses who testified for the contestants stated that in the last years she was getting childish. Such a conclusion, without being based upon facts showing that she was childish, should have little weight. (*McGrady* v. *McGrady*, 298 Ill. 129.) Most of the witnesses who testified on behalf of appellant had a better opportunity to judge of the mental condition of testatrix than did many of the witnesses who testified for contestants. The law does not require a testator to make a fair, just and reasonable disposition of the property in accordance with the rules of descent in this State. It only requires that the person making the will shall be of sound mind, and permits him to make any lawful disposition of his property that he desires to make. The fact that in this case the grandson received a very small legacy in the last will, apparently receiving none in the first will in view of the fact that his deceased father had been given his share of the estate years before, would not tend in the least to indicate that the testatrix was acting unfairly or that her mind was unbalanced, and from the record before us we can say, in view of all the facts, that the fact that the daughter, who lived some distance from the testatrix and as we read the record did not give anything like the care and attention to her mother that the son gave during those last years, was given a less amount than the son does not, in our judgment, support the conclusion that the testatrix was of unsound mind. In view of the fact that we find nothing in the record indicating that any of the neighbors testified to any facts showing mental incapacity, and the fact that so many of the witnesses who had the most to do with her during the last years of her life and had the best opportunity to judge of her mental condition thought she was of more than ordinary intelligence and that her mental condition was unchanged during those last years, we can reach no other conclusion than that the weight of the unbiased testimony supported strongly the conclusion that the testatrix

was of sound mind and disposing memory and that the verdict is against the preponderance of the evidence in that regard, and that there is no evidence of any character from which any reasonable inference can be drawn that the will was the result of undue influence.

The decree of the circuit court will be reversed and the cause remanded to that court for further proceedings.

*Reversed and remanded.*